UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

HENRY NEZ, JR; HAROLD BROWN;
VERNON YAZZIE; and HECTOR
MAYORGA on behalf of themselves and others
similarly situated,

        Plaintiffs,

    v.

SOUTHWEST GLASS AND GLAZING, INC.,     Case No.  1:15-cv-01041-RJ-LF
ANTHONY S. BACA, CAROL J. MCCARTHY,
AND KIRA A. SOWANIC, et. al.,

        Defendants.

## <u>MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

## I.    INTRODUCTION

Plaintiffs Henry Nez, Jr., Harold Brown, Vernon Yazzie and Hector Mayorga, on behalf of themselves and others similarly situated, (collectively "Plaintiffs") hereby file their Response to the Motion for Summary Judgment ("MSJ") filed by Defendant Southwest Glass and Glazing, et. al. ("Southwest Glass," "SWG" or "Defendants"). Plaintiffs ask this Court to deny the MSJ for one or more of the below reasons.

First, they failed to demonstrate an absence of dispute of material fact on all elements of the Fair Labor Standards Act ("FLSA"), New Mexico Public Works Minimum Wage Act ("NMPWMA"), and New Mexico Minimum Wage Act ("NMWA") claims as required by Federal Rules of Civil Procedure ("FRCP"), Rule 56, in that: (a) Defendants failed to address all of the elements of all claims; (b) as to some elements, Defendants' Statement of Undisputed Material Facts ("UMF") sets forth conclusory statements either misinterpreting or omitting material portions of discovery, rather than containing concise statements of material fact as required by New Mexico

District Court Local Rule 56.1(b); (c) the evidentiary support in the UMF largely relies upon Defendants' witnesses' opinions and conclusions in violation of Rule 56. Defendants' motion is based in part upon an affirmative defense on which they carry the burden of proof as to each element. (See Sec.V(B)). Second, Defendants failed to demonstrate they are entitled to judgment as a matter of law as to each element of the claims and affirmative defense.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

A party seeking summary judgment always bears the initial responsibility of identifying evidence which it believes demonstrate the absence of a genuine issue of material fact as to any element of the claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 331 (1986). If the Defendants fail to carry this initial burden of production, then Plaintiffs have no obligation to respond or produce anything in opposition to the motion and the motion must be denied. *Nissan Fire and Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).[1] Generally, "New Mexico courts ... view summary judgment with disfavor, preferring a trial on the merits." *Segura v. J.W. Drilling, Inc.*, 355 P.3d 845, 847, *cert. denied*, 369 P.3d 368 (2015).

If the burden of production is satisfied, then the Defendants must also affirmatively demonstrate that no reasonable trier of fact could find other than for Defendants. *Shakur v. Schriro*, 514 F.3d 878,890 (9th Cir. 2008); *Bradescu v. Hillstone Restaurant Group, Inc.*, 2014 WL 5312546*9 (C.D.Cal.) (As party moving for summary judgment based on its own defense, to prevail on summary judgment, defendant must show that the "evidence is so powerful that no reasonable jury would be free to disbelieve it."). The Court must accept as true any evidence produced by the

---

[1] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] ruling on a motion for summary judgment […] The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby, supra*, 477 U.S. 242 at 255.

plaintiffs and any reasonable inferences that may be drawn from any facts before the Court must favor the plaintiffs. If conflicting inferences may be drawn, the MSJ must be denied. *Gregory v. United Parcel Service, Inc.*, 2015 WL1956435 *2 (E.D.Cal.).

For the reasons herein, Defendants have failed to carry their burden. To the contrary, much of Defendants' own cited evidence points to disputes of material fact. To assess liability, a trial assessing both Plaintiffs' timesheets and paystubs, and their testimony on work performed, is necessary. Though Defendants failed to meet their burden, Plaintiffs can also show evidence demonstrating disputed material facts. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007).

## III.    LEGAL ELEMENTS TO CONSIDER ON SUMMARY JUDGMENT

Plaintiffs allege that travel time is compensable under any of the following conditions: First, the time spent is spent predominantly for the employer's benefit. *United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1116 (10th Cir.1999). Second, "[w]here an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice." 29 C.F.R. § 785.38.[2] Third, when travel keeps an employee away from home overnight and cuts across the workday. 29 C.F.R. § 785.39. Fourth, otherwise compensable driving time when an employee requests to drive his own vehicle rather than take offered transportation. 29 C.F.R. § 785.40.[3] In contrast, Defendants contend that travel time is only compensable when: the employee performs work duties while travelling, or the employee drives a vehicle equipped with critical equipment without which the work cannot be performed. Defendants assert their opinion that employees were not *required* to report to the main shop and *rarely* transported tools. Such opinions are disputed. Defendants' MSJ fails not only omits

---

[2] "If an employee normally finishes his work on the premises at 5 p.m. and is sent to another job which he finishes at 8 p.m. and is required to return to his employer's premises arriving at 9 p.m., all of the time is working time […]" *Id.*

[3] "[A]dministrative interpretations are to be given especially authoritative weight when [as here] (1) the interpretative rule embodies a construction made contemporaneously with the enactment of the statute ... or (2) when the interpretative regulation or policy is of long standing." *Oil Shale Corp v. Morton*, 370 F.Supp. 108, 122 (D.Colo.1973), citing Davis, Administrative Law, Vol. I, § 5.06 at p. 324, (1958).

legal elements, but fails to establish the absence of material facts as to the requisite elements.

Next, Defendants' assertion that no violation of NMPWMWA occurred rests on the erroneous presumption that glazier duties solely encompass two discrete tasks: (1) setting glass and (2) erecting frames, whereas all other work performed at job sites can be categorized as Group III semiskilled Laborer work. Plaintiffs' work encompasses that outlined in the definition of a glazier.[4] See 11.1.2.17(Q) NMAC. Defendants' own witnesses concede that work other than setting of glass and erecting of frames is necessary to accomplish the work of a glazier.[5] Moreover, the definition of Group III Laborer does not reflect Plaintiffs' work. Defendants have not and cannot establish it.[6]

Defendants' MSJ is bereft of any facts establishing their compliance with apprenticeship standards. *See* 11.1.2.19(A)(1)-(4) NMAC. Rather, as established in the statement of Material Disputed Facts ("DMF"), former Southwest Glass Vice President Carol McCarthy, responsible for payroll, stated she did not understand the term "indentured." SWG arbitrarily re-classified "apprentices" as "glaziers" temporarily to meet a ratio needed to employ other apprentices at a pay rate lower than the glazier rate. (See Response to UMF No. 9). SWG's contradictory time classification practices and deposition testimony explicitly expressed the belief that an apprentice need not or does not perform the work of the trade in which they are indentured, which is legally non-compliant under their logic. *See id.* at (3) .

## IV.    MATERIAL FACTS IN DISPUTE

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|-----|-----------------|--------------------------------------------------------|
| 1. | 5. "Southwest Glass employs field employees...depending on their | Yazzie has at least 15 years of experience working with SWG, yet he is still classified as a helper. |

---

[4] Ex. 5, Deposition of Harold Brown ("Brown Depo"), 32:3-24; 41:3-21; Ex. 4, Deposition of Vernon Yazzie ("Yazzie Depo"), 39:8-25 (example of misclassified time); 40:12-19.

[5] Ex. 12, Arrellin Depo, 6:2-7:6; Ex. 10, Baldonado Depo, 5:23-7:7 ('other' tasks are necessary and part of glazing).

[6] See Public Works Minimum Wage Act Policy Manual's definition of Group III semi-skilled laborer: "(base): air and power tool opr. (not a carpenter's tool); asbestos remover; asph. heaterman; asph. jointman; asph. raker; batching plant scaleman; chain sawman; concr. touch-up man; concr. sawman - coring mach.; curbing mach. asph. or cement; cutting torchman; metal form setter-road; grade setter; guniteroundmen; rod and chainmen; concrete power buggy opr.; powderman or blaster helper; sandblaster (pot men); nozzlemen; scaler; vibratorman (handtype); vibratory compactor (hand type); wagon core and diamond drillers' tenders (outside); window washers; fog mach. opr.; nurseryman-gardener; multi-plate setter; conc. burner; cement mason tenders; hodcarriers; mortar mixers; plaster spreader opr.; plaster tenders; gunitenozzlemen; pipelayer; pumpcretenozzlemen; manhole builder; roadway hardware worker." 11.1.2.18(N)(Appendix J)(3).

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|---|---|---|
| | experience." | Brown has at least 4 years of experience working with SWG, yet he is still classified as a helper. *See* Defendants' MSJ Ex. 6, Doc. 74-6, p. 14 of 41 (The word "leadman" is crossed out and the word "helper" is written in its place. SWG made this notation in 2014 when Yazzie had 14 years of glazing experience with SWG. Despite SWG's stated practice of classifying employees according to their "years of experience," and specifically, classifying employees as "helpers" if they had minimal to no glazing experience, SWG did not re-classify Yazzie as a glazier in the 2014); *compare with* Ex. 1, Deposition of Antony Baca ("Baca Depo"), 26:14-28:1 (stating "if they have no experience, no glazing experience when they come to work for us, they are classified as a helper" and to be a glazier "they would have to have to have a proven, verifiable track record"); 125:16-126:10 ("if [Yazzie] was the highest paid guy on the job and needed to get a ratio, yes, he would be deemed a glazier for that period of time"); 128:23 – 129:20 (stating that the hiring rate is "all discretionary…It's just basically what they negotiated at the time. It depends on how badly we need them." ); Ex. 2, Deposition of Carol McCarthy, ("McCarthy Depo"), 30:21-22 ("the pay rate would be based on whether or not they are classified as a glazier or a helper or a laborer"); 35:11-37:9 (starting pay rate is "discretionary" and starting job classification determination is "made by the superintendent based on their skill level;" pay rate only changes over time if "the general manager, sometimes the superintendents" give a raise."). |
| 2. | 6. "an employee must be registered in an apprenticeship program…and the apprenticeship program regularly advises Southwest Glass." | Ex. No. 1, Baca Depo, 79:11 - 80:13; Ex. 2, McCarthy Depo, 13:11-15; 99:14-100:22; 102:9-105:11; 109:14-110:9 |
| 3. | 7. "Southwest Glass employees…are paid wage rates determined by the New Mexico Department of Workforce Solutions for all work performed on the job site." | Defendants are not paying the correct prevailing wage rate for all work performed by virtue of SWG's arbitrary and inadequately defined assignment and shifting re-assignments of the job classifications of "helper," "designated glazier" and "apprentice". Defendants have not and cannot indicate any justifiable basis as to why arbitrarily assigned job titles allows them to pay "helpers" less than the glazier prevailing rate for the same work performed by "designated glaziers." Ex. 13, |

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|---|---|---|
| | | SWGLASSS009039, p. 13 [contract certifying that prevailing wages will be paid to *all* employees for the contracted-for work performed on the public works project]. Further, Defendants' failure to accurately record duties and all hours worked on timecards results in the non-payment or underpayment of wages. See also Ex. 1, Baca Depo, 26:14-28:1; 125:16-126:10; 128:23 – 129:20; Ex. 2, McCarthy Depo, 30:21-22, 35:11-37:9, 38:5-39:1, Ex. 6, Deposition of Hector Mayorga ("Mayorga Depo"), 58:20-59:14 (foreman who filled out timecards not present to observe what work Mayorga is doing); Ex. 10, Deposition of Lorenzo Baldonado, ("Baldonado Depo"), 58:9-24 (alters timecard to reflect another task); 61:8-11 (changes timecards once or twice a month); 26:5-23 (only on the job site 2-3 hours per day to observe glaziers work); Ex. 12, Deposition of Jordan Arrellin ("Arrellin Depo"), 60:2-11 (fills out timecards for employees only from memory at the of end of week); 23:23-25; 21:23-22:4; 23:1-6; Ex. 11, Deposition of Don Walker, ("Walker Depo"), 12:17-25 (he is at different job sites for limited durations); 15:7-10; Ex. 8, Deposition of Nancy Jarvis, ("Jarvis Depo"), 22:2-3 (would omit time from timecards "if I was directed by the superintendent"); 23:8-24:8; 49:25-51:23 ("…if it was on their time card but it wasn't on the work order, their time gets X'd off…"); 59:21-61:2 ("…instead of having to use white out everywhere, if they write in pencil, I'm able to change a number…" on a timecard); Ex. 14, Deposition of Max Chavez, ("Chavez Depo"), 22:7-23:8 (calls foreman to verify and then change glaziers' time on timecards); Ex. 9, Deposition of Joe Cordova, ("Cordova Depo"), 16:4-17:3; 33:24-34:16; 41:7-42:13; 36:6-17 ("…we've kind of gotten lax on those [daily logs]") |
| 4. | 8. "Employees…are paid the designated glazier wage rate for all work performed on the job site." "Apprentice glaziers are paid an apprentice rate, which is a percentage of the glazier rate depending on where each apprentice is in the apprenticeship program, for all work performed on the job site." "Employees…are paid the designated laborer wage rate …for all work | Ex. 1, Baca Depo, 26:14-28:1; Ex. 13, SWGLASS0001112; 1271; 1328; 1409, 1-5 [paystubs for Hector Mayorga, claimed by SWG to be an apprentice, showing varying pay rates and differing rates according to the type of work duties performed.]<br><br>The NMPWA does not allow for a division of pay rates for the same work duties performed on public works site based upon an employer's |

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|---|---|---|
| | performed on the job site" "duties within the New Mexico Department of Workforce Solution's definition of "glazier" work, for which time they are paid the glazier wage rate" | arbitrarily assigned job classifications founded on vague, undefined levels of experience and skill. Further, the definition of a semi-skilled Group III Laborer under Type B and C construction does not encompass the other performed by field employees other than setting glass and erecting frames. |
| 5. | 9. "employees are paid the designated glazier wage rate for all work performed on the job site." | Defendants' temporary elevation of apprentices to designated glaziers evidences their arbitrary pay practices not in compliance with NMPWMWA. Ex. 7, Plaintiffs' Response to Rog. No 7, 9 and 10 [detailing occurrences in which all time was either misclassified or not recorded on time cards, including travel time, and therefore was underpaid or not paid]; Ex. 6, Mayorga Depo, 56:18-16 [travel not on recorded on timecard]; Ex. 1, Baca Depo, 108:22-24 [travel time not recorded on timecard], 107:22-25 [only paid for time on timecard]. |
| 6. | 10. "field employees perform certain preparatory tasks on a daily basis. Each day employees perform tasks described as "set up." "These tasks consist of collecting tools from a central, secured location…" | Set-up did not always occur every day, rather it typically occurred on Mondays. Employees did not always collect tools from a secured location each day of work. *See* Ex. 3, Deposition of Henry Nez, Jr. ("Nez Depo"), 31:23-32:1; Ex. 4, Yazzie Depo, 15:6-10; Ex. 3, Nez Depo, 56:13-23 [foreman told him to report to shop to load]; Ex. 5, Brown Depo, 15:9-13 [obtains tools from his vehicle at the job site]; Ex. 6., Mayorga Depo, 14:13-16, 15:4-6; Ex. 4, Yazzie Depo, 19:12-14; 24:4-25:11. |
| 7. | 11. "Another preparatory task performed each day is referred to as "materials distribution…" | Materials distribution did not always occur every day, rather it typically occurred on Mondays and materials were left staged out for the following days of work. *See* Ex. 3, Nez Depo, 30:10-16; Ex. 5, Brown Depo, 18:1-17; Ex. 4, Yazzie Depo,16:5-13 |
| 8. | 12. "Time spent in set up and material distribution varies from day to day…" | Set-up and material distribution did not always occur every day. Defendants cite to testimony of superintendents who were not present at the worksite for the entire duration of a project. See Ex. 3, Nez Depo, 30:10-16; Ex. 5, Brown Depo, 18:1-17; Ex. 4, Yazzie Depo, 16:5-13; see also Plaintiffs' citations responding to UMF No. 7. |
| 9. | 13. "…Department of Labor personnel advised Southwest Glass that it was permissible pursuant to the Public Works Act to average the time spent on set up and material distribution tasks on a daily basis" … "[DWS] personnel | Defendants' own witness testimony is conflicting, and thus disputed, as to how and whether DWS, formerly known as the Department of Labor, provided this direction, which was not memorialized in writing or any official capacity. *See* Ex. 2, McCarthy Depo, 60:4-8, 56:9-58:21 (stating |

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|---|---|---|
|  | advised that one-half hour of set up time and one-half hour of material distribution time was a reasonable average." | "I don't believe [John Minks] specifically said that, no,"…in response to whether SWG was told during the 2000 audit to put half-hour of material distribution each day of the week), 59:1-60:11 (stating "no, I did not" personally receive any instruction from the DWS that certain time could be paid at the laborer rate); *compare with* Ex. 1, Baca Depo, 59:14-62:23; 70:8-71:7 (when asked how DWS communicated the direction to designate an average time for material distribution and set-up, stating "Carol McCarthy met with John –I believe his name was John Minks, who was the Director of Workforce Solutions or Department of Labor back in 2000"). |
| 10. | 14. "Pursuant to the definitions regulated by the [DWS], the only duties categorized as glazing work…are erecting frames and installing glass." <br><br> "It is, however, each individual employee's responsibility to keep track of and differentiate between which of the above tasks they performed…" | Ex. 4, Yazzie Depo, p. 10:2-25; Ex. 6, Mayorga Depo, 7:10-9:4; see also Plaintiffs' citations responding to UMF No. 7; Ex. 12, Arrellin Depo, 6:2-7:6; Ex. 5, Brown Depo, 32:3-24; 41:3-21; Ex. 4, Yazzie Depo, 39:8-25 (example of misclassified time); 40:12-19; Ex. 10, Baldonado Depo, 5:23-7:7 (tasks other than erecting frames and installing glass are necessary to do glazing). <br><br> Ex. 1, Baca Depo, 75:6-20 (stating that responsibility for one's own time is "advice," not a policy and employees "have to suffer consequences" if they don't do it right); 112:11-14. Regardless of Defendants' attempt to pass blame, it is the *employer's* legal obligation to keep accurate records, and thus, ensure that time worked is recorded properly. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946) (recognizing an employer's statutory duty to keep proper wage and time records.). |
| 11. | 15. "Southwest Glass pays employees for the time spent travelling from one job site to another job site within the work day." | Ex. 6, Mayorga Depo, 27:21-28:4, 64:3-67:12; Ex. 5, Brown Depo, 48:19-50:9 [never told how travel time calculated; Ex. 4, Yazzie Depo, 28:22-29:11 (not paid travel time) |
| 12. | 16. "Southwest Glass does not require field employees to report to its Albuquerque shop at the beginning of the work week or to return to the Albuquerque shop at the end of the work week…" | Ex. 3, Nez Depo, 26:10-25; 27:10; Ex. 6, Mayorga Depo, 14:13-16, 15:4-6, 55:16-19 [Mayorga knew to report at shop at 5am]; Ex. 3, Nez Depo, 26:10-27:10, 55:1-56:9 [required to report to shop depending on location of job], 56:13-23 [foreman told him to report to shop to load], 57:7-23; 60:9-25 [supervisor told him to report to shop], 61:20-63:17 [Nez denies that he was "not required" to report to the shop]; Ex. 1, Baca Depo, 49:1-10 |

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|-----|-----------------|------------------------------------------------------|
| | | [testified the employees "get tools" and "fill out paperwork" at the shop); Ex. 12, Arellin Depo, 17:8-11; Ex. 9, Cordova Depo, 17:13-25 [at the shop, employees "usually, get their materials for the week…"); 60:1-19; Ex. 10, Baldonado Depo, 8:18-23 [glaziers transport materials]; Ex. 5, Brown Depo, 15:9-13 [obtains tools from his vehicle at the job site]; Ex. 4, Yazzie Depo, 19:12-14; 24:4-25:11 [foreman told him to report to shop to load up truck]). |
| 13. | 17. "Many…employees go to the…shop…to catch a ride in a company vehicle…and then return to the… shop…to collect their personal vehicles left at the… shop." | Ex. 4, Yazzie Depo, p. 28:5-9; Ex. 3, Nez Depo, 60:9-25, 61:20-63:17; Ex. 6, Mayorga Depo, 55:16-19; 56:18-16 |
| 14. | 18. "*Usually* materials…are delivered to the job site by a special delivery truck driven by a shop, as opposed to a field, employee"… "*Occasionally*," a company truck transporting employees to a job site will tow a trailer with additional supplies." "On *rare* occasions,…employees who voluntarily report to the…shop…to ride in a company vehicle to the job site will spend time loading a trailer with materials for the job. They are paid for this time." | There are disputes as to Defendants' temporal characterizations "usually," "occasionally" and "rarely." Ex. 1, Baca Depo, 49:1-10 [testified the employees "get tools" and "fill out paperwork"); Ex. 12, Arellin Depo, 17:8-11; Ex. 9, Cordova Depo, 17:13-25 [at the shop, employees "usually, get their materials for the week…"); 60:1-19; Ex. 10, Baldonado Depo, 8:18-23 [glaziers transport materials]; Ex. 5, Brown Depo, 15:9-13 [obtains tools from his vehicle at the job site]; Ex. 6., Mayorga Depo, 14:13-16, 15:4-6; Ex. 4, Yazzie Depo, 19:12-14; 24: 4-25:11 [foreman told him to report to shop to load up truck]). |
| 15. | 19. "employees who work on out-of-town projects are paid a lump sum per diem, which includes imbursement for the cost of overnight accommodations and meals…" | Ex. 6, Mayorga Depo, 23:16-25:13; 27:2-20; Ex. 5, Brown Depo, 33:19-23; 36:22-25; Ex. 1, Baca Depo, 107:22-25 [only paid for time on timecard]. |
| 16. | 20. "Southwest Glass pays all field employees at the rate of $10.00 per hour for the average time it would take to travel from the… shop at the beginning of the week to the job site and returning from the job site to the…shop at the end of the week." "Employees are paid this amount regardless of whether they drive or ride and …whether they come to the…shop to ride in a company vehicle or travel from their homes directly to the job site …". | See Plaintiffs' citations responding to UMF No. 19 above; see also Baca Depo, 107:22-25 [only paid for time on timecard]. |
| 17. | 21. "… Some employees… rely on their | Glaziers are not given an opportunity to review |

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|---|---|---|
| | assigned foremen to complete their time cards for them. … … employees who do not fill out their own time cards may review their time cards and contest any perceived discrepancies before their time cards have been turned in to payroll….an employee who believes he has been paid incorrectly may take the issue up with a foreman, superintendent, or any member of Southwest Glass' management, including Baca." | and approve time cards prior to their submission to payroll. They must ask to review them if they discover a discrepancy upon receiving a paycheck, but doing so did not assure that their time was corrected. Ex. 1, Baca Depo, 114:5-18; Ex. 5, Brown Depo, 20:8-11; 21:11-25; 31:7-10; Ex. 6, Mayorga Depo, 57:25-5, 65:16-24 ("we always got stepped on when we went to the superintendent's office…we never got an answer"); Ex. 3, Nez Depo, 55:4-10; Ex. 4, Yazzie Depo, 50:8-15; 51:2-16 |
| 18. | 22. "DWS has audited seven (7)…projects to determine whether Southwest Glass has complied with the requirements of the New Mexico Public Works Minimum Wage Act….This documentation showed the wage rates paid…and…duties performed…the number of hours that were devoted to each duty each day." | The documents actually reviewed and areas investigated by DWS are unknown. Ex. 2, McCarthy Depo, 60:4-8 [did not specifically discuss classification of material distribution or set-up at the laborer rate at audits during the recoverable period], 56:9-58:21 [does not recall John Minks instructing how to designate time for a particular duty], 59:1-60:11. |
| 19. | 23. "three (3) have been concluded with no findings of any violations. One of the audits concluded with a finding that Southwest Glass had erroneously underpaid one employee by the amount of $926.83.40 Another audit concluded that Southwest Glass had underpaid five (5) employees by a combined total of $419.63. A third audit concluded that Southwest Glass had underpaid three (3) employees a trifling combined total of $11.16. The only other audit that concluded that Southwest Glass had underpaid two (2) of its employees had a finding of a trivial combined total of $36.42. | This statement misrepresents the nature of the violations and scope of the audits. First, the audits were performed on only 7 of approximately 276 public works projects done in the recoverable period. Ex. 15, Defendants' Response to Rog. 1, SWGLASS008870-8875 [276 projects in the recoverable period]; Ex. 16, Defendants' Response to Request for Production No. 1 [same]. Second, the audits investigated unknown areas and did not involve all of the plaintiffs. Ex. 13, SWGLASS000914-917, 920-921, 8869, p. 6-12 [audit findings show SWG violated the Public Works Minimum Wage Act and failed to pay all prevailing wages and fringe benefits owed, but did not disclose areas investigated or all documents reviewed.] Plaintiffs dispute Defendants' characterization of the violations found in the audits as "trivial," and "trifling," particularly considering the extrapolation of similar such violations across the class of 250 glaziers for all 276 projects. Plaintiffs' further contend that the audits are not representative, nor dispositive to the claims in this suit. For example, Defendants' failure to pay the overtime rate for work over 40 hours in a week, failure to pay the glazier rate for glazier work, and underreporting and omission of hours worked is not readily identifiable from only |

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|---|---|---|
| | | a review of the records, rather the testimony of Plaintiffs is necessary to detect such violations. |
| 20. | 25. "Nez did not generally report to the Albuquerque shop…" "If the job site was on the eastern side of the state and Nez' route to it would take him through Albuquerque, he would then sometimes go to Albuquerque and ride in a company vehicle from Albuquerque." | Ex. 7, Plaintiffs' Response to Defendants' Interrogatory ("Plaintiffs' Response to Rog. No.") No. 7, 9 and 10; Ex. 3, Nez Depo, 39:6-40:23; 41:1-23. |
| 21. | 26. Nez' typical work week schedule consisted of four (4) ten (10) hour days, beginning on Monday morning and ending Thursday evening. | Ex. 3, Nez Depo, 52:20-53:1. |
| 22. | 27. Nez was required to report to the job site on Monday morning, and would return directly home at the end of the work day on Thursday unless he drove or carpooled in a company vehicle. Only then would Nez return to the Albuquerque shop before heading home. | Ex. 3, Nez Depo, 60:9-25; 61:20-63:17. |
| 23. | 28. Nez was paid at the designated glazier wage rate for all of his work on the job site. | Ex. 7, Plaintiffs' Response to Rog. Nos. 7, 9 and 10; see also Plaintiffs' citations responding to UMF No. 7. |
| 24. | 29. Nez received subsistence for any out-of-town and private projects he worked on, which included a weekly per diem to cover food and lodging expenses, as well as a $10 per hour imbursement for the calculated average amount of drive time from the Albuquerque Shop to the out-of-town job site and back to the shop even though he did not usually go to the Albuquerque shop. | Ex. 3, Nez Depo, 55:1-56:9; 56:13-23, 57:7-23; 60:9-25, 61:20-63:17. |
| 25. | 30. Nez was well-informed that it was his responsibility as a Southwest Glass employee to fill out his time card correctly, although there were times that he conceded to have his Foreman fill out his time card for him. | Ex. 1, Baca Depo, 75:6-20. |
| 26. | 32. "Brown was not required to report to …[the] shop…". "if Albuquerque was closer to Brown's residence than the job site then he would go to the shop before heading to the job site –he did this for the sole purpose of riding in a company vehicle rather than taking | Harold Brown's testimony within Defendants' cited pages of his deposition states that he sometimes took his own vehicle from the shop to the Roswell job site for personal reasons, which contradicts Defendants claim that he solely reported to the shop to ride in the company truck. Ex. 5, Brown Depo., 38:18-24. |

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|---|---|---|
| | his personal vehicle." | |
| 27. | 33. Brown was paid at the designated laborer wage rate for all of his work on the job site unless he erected frames or set glass, in which case he was paid the glazier rate for his time spent on those activities. | Ex. 5, Brown Depo, 15:2-6, 17:5-7, 18:7-13, 16:2-11; 29:5-32:24. |
| 28. | 34. Brown received Subsistence for any public works projects he worked on, which included a weekly per diem to cover food and lodging expenses, as well as a $10 per hour imbursement for the calculated average amount of drive time from the Albuquerque Shop to the out-of-town job site and back to the shop. | Ex. 5, Brown Depo, 48:19-50:9. |
| 29. | 35. "it was, ultimately, Brown's responsibility… to fill out his time card correctly…" | Ex. 5, Brown Depo, p. 13:6-9. |
| 30. | 37. Yazzie was not required to report to Southwest Glass' Albuquerque shop. Whether he first reported to the Albuquerque shop to ride in a company vehicle or just drove his personal vehicle directly to a job site was Yazzie's decision, and his choice on the matter was determined on a job-by-job basis. | Ex. 4, Yazzie Depo, 28:5-9, 28:22-29:5 29:6-11; see also Plaintiffs' citations responding to UMF No. 16. |
| 31. | 38. Yazzie's typical work week schedule consisted of four (4) ten (10) hour days, beginning on Monday morning and ending Thursday evening. | Ex. 4, Yazzie Depo, 27:20-23. |
| 32. | 39. Yazzie was paid at the designated laborer wage rate for all of his work on the job site unless he erected frames or set glass, in which case he would receive the glazier rate. | Ex. 4, Yazzie Depo, 14:24 – 15:14; Ex. 7, Plaintiffs' Response to Rog. Nos. 7, 9 and 10; see also Plaintiffs' citations responding to UMF No. 7. |
| 33. | 40. Yazzie received Subsistence for any public works projects he worked on, which included a weekly per diem to cover food and lodging expenses, as well as a $10 per hour imbursement [sic] for the calculated average amount of drive time from the Albuquerque Shop to the out-of-town job site and back to the shop. | Ex. 4, Yazzie Depo, 28:5-21, 26:12-22 |
| 34. | 41. Yazzie understood that it was his responsibility as a Southwest Glass | Ex. 1, Baca Depo, Baca Depo, 75:6-20 (stating the responsibility was not a policy, rather it was |

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|---|---|---|
| | employee to fill out his time card correctly; however there were times that his Foreman would fill out his time card for him. | "advice"); Ex. 7, Plaintiffs' Response to Rog. Nos. 7, 9 and 10 [almost always foremen filled out timecards for glaziers]. |
| 35. | 42. "…Mayorga was employed by Southwest Glass as an Apprentice working in the field on construction projects from approximately July 2010 to February 2016." | Ex. 6, Mayorga Depo, 6:1-7:12; Defendants' MSJ Ex. 6, Doc. 74-6, p. 28 of 41 [document, dated 6/24/14, states "rehired as a helper. Must also get into apprentice program."]; Defendants' MSJ Ex. 6, Doc. 74-6, p. 31 of 41 [document refers to Mayorga as a "helper."]. There exists a material issue of fact as to whether and when Mayorga was a properly indentured apprentice in accordance with the requirements of the NMPWMWA. |
| 36. | 43. " …Mayorga regularly reported to [the] shop at the beginning of the work week, although doing so was not mandatory. Mayorga would then ride in a company vehicle with other Southwest Glass employees to an out-of-town job site and then return to Albuquerque after the completion of the work day on Thursday." | Ex. 6, Mayorga Depo, 14:13-16, 15:4-6; 55:16-19 [Mayorga knew to report at shop at 5am]. |
| 37. | 44. Mayorga's typical work schedule consisted of four (4) ten (10) hour days, beginning on Monday morning and ending Thursday evening. | Ex. 6, Mayorga Depo, 22:2-23:15; see also Ex. 7, Plaintiffs' Response to Rog Nos. 7, 9, and 10; see also Plaintiffs' citations responding to UMF No. 7. |
| 38. | 45. Mayorga was paid at the designated apprentice wage rate for all of his work on the job site. | Ex. 6, Mayorga Depo, 7:10-12, 25:24-27:1; see also Ex. 7, Plaintiffs' Responses to Rog Nos. 7, 9, and 10; Ex. 13, SWGLASS0001112, 1271, 1328, 1409, pp. 1-5 [Mayorga's paystubs showing varying rates paid that were not all apprenticeship rates]. |
| 39. | 46. Mayorga received Subsistence for any public works projects he worked on, which included a weekly per diem to cover food and lodging expenses, as well as a $10 per hour imbursement for the calculated average amount of drive time from the Albuquerque Shop to the out-of-town job site and back to the shop. | Ex. 6, Mayorga Depo, 23:16-25:13; 27:2-20 |
| 40 | 47. "understood that it was his responsibility.. to fill out his time card correctly; however there were times that his Foreman would fill out his time card for him." | Ex. 7, Plaintiffs' Response to Rog. No 7, 9 and 10 [typically foremen filled out timecards]; Ex. 1, Baca Depo, Baca Depo, 75:6-20 (stating the responsibility of employees keeping time was not a policy, rather it was "advice"). |
| A. | Plaintiffs' DMF: Defendants did not record, nor compensate Plaintiffs for all of the time spent travelling between job | Ex. 6, Mayorga Depo, 27:21-28:4, 64:3-67:12. |

| No. | Defendants' UMF | Plaintiffs' Supporting Evidence Showing Factual Dispute |
|---|---|---|
| | sites either during the workday or overnight. | |
| B. | Plaintiffs' DMF: Defendants failed to follow to be properly informed of and follow the NMPWMA's requirements for apprentices to be properly indentured and working within the trade in which they are training. | Ex. 2, McCarthy Depo, 13:11-15; 99:14-100:22; 102:9-105:11; 109:14-110:9; Ex. 1, Baca Depo, 79:11-80:13. |
| C. | Plaintiffs' DMF: Defendants did not accurately record time on Plaintiffs' timecards. Plaintiffs' timecards underreported hours worked and/or misclassified the type of work performed on timecards. | Ex. 7, Plaintiffs' Response to Rog. Nos. 7, 9 and 10; see Plaintiffs' citations in response to UMF No. 7; Ex. 5, Brown Depo, 32:3-24; 41:3-21; Ex. 4, Yazzie Depo, 39:8-25 (example of misclassified time); 40:12-19. |
| D. | Plaintiffs' DMF: Defendants' misclassification of work duties performed by Plaintiffs resulted in the underpayment of wages and fringe benefits on public works projects. | Ex. 13, SWGLASS0001112, 1271, 1328; 1409, pp. 1-5 |
| E. | Plaintiffs' DMF: Defendants automatically designated one half hour of "material distribution" and one half hour of "set-up" for each day of work, regardless of the work actually performed and the amount of time spent on material distribution and set-up. | Ex. 7, Plaintiffs' Response to Rog. Nos. 7, 9 and 10; Ex. 5, Brown Depo, 32:3-24; 41:3-21; Ex. 4, Yazzie Depo, 39:8-25 (example of misclassified time); 40:12-19. |

Defendants' statement of UMF (Doc. 74 ¶¶ 1-46) makes several conclusory statements with respect to only some of the legal elements of Plaintiffs' claims and proffers insufficient and/or mischaracterized "evidence" to support such statements. As such, their MSJ fails.

## V. ARGUMENT

### A. Plaintiffs' travel time to/from job sites and to/from the shop and job sites should have been counted as hours worked, and thus, Plaintiffs are entitled to overtime damages and MSJ must be denied

#### 1. There are Issues of Material Fact with Respect to Travel Time

Plaintiffs' FLSA overtime claim is, in part, premised on Defendants' failure to account for compensable travel time in total hours worked. Plaintiffs' time spent traveling from the shop to the job site, and time spent travelling between job sites, is compensable under both the regulations and

controlling case law interpreting FLSA, discussed below. Defendants' arguments on this issue fail as there are material issues in dispute.

First, Plaintiffs were told by foreman and superintendents where to report, and thus, were required to report to the shop. The fact that Plaintiffs *could* report directly to the job site if it was closer to their residence, does not change this fact. Glaziers did not report to the shop *solely* to "catch a ride" for their own convenience. See Defendants' MSJ at p. 5, 8-9, 13. Rather, they reported to the shop to transport the materials and tools to the job site. They reported to the shop to pick up per diem payments, when provided. They reported to the shop to drop off timesheets to get paid. Second, deposition testimony from both Plaintiffs and Defendants' witnesses evidence that employees *usually* transported tools and materials from the shop to the job sites, and helped load materials, regardless of whether shop employees had first loaded trucks. The frequency with which employees went directly to the shop does not render all other compensable travel time non-compensable, rather it is a factual issue that goes to damages, not liability. Further, Defendants' MSJ ignores evidence that they did not compensate Plaintiffs for time spent travelling between job sites. Defendants also ignore evidence that Plaintiffs were not compensated for overnight travel. See 29 C.F.R. § 785.39; Ex. 6, Mayogra Depo, 63:1-65:18.

There is ample evidence here that employees were told to report to the shop and transported tools and materials to the job site, yet SWG's practice was not to record this time on timecards. *See* 29 C.F.R. § 785.38; See Response to UMF No. 16. The failure to account for this compensable time resulted in the non-payment of overtime wages for this work. See *Marshall v. R & M Erectors, Inc.*, 429 F. Supp. 771, 777–78 (D. Del. 1977)(under analogous facts to the present case, finding defendants violated FLSA because no adjustment was made in an employee's weekly wage to reflect any fluctuation in the hours worked during the week);[7] *Preston v. Settle Down Enterprises, Inc.*, 90 F.

---

[7] The Court examined the following analogous facts as are present here and concluded that the plaintiffs were entitled to overtime:
> On the typical day, the employees reported to the Bridgeville office at 6:00 A. M. Sometimes small tools or supplies were loaded into defendants' vehicles, and perhaps the vehicles were serviced; the employees then learned from Hastings where the day's work would be performed. Because the job sites were scattered throughout Maryland, an automobile trip

Supp. 2d 1267, 1280 (N.D. Ga. 2000) (citing *Dole v. Enduro Plumbing*, No. 88–7041–RMT, 1990 WL 252270 at * 2 (C.D.Cal. Oct.16, 1990) (finding travel time compensable when "workers reported to a shop where they checked in, met their fellow workers, picked up the company trucks, and loaded tools on the trucks when needed.")) Further, *Dole* recognized that "[w]here ... an employee is required to report to a designated meeting place ... to receive instructions before he proceeds to another workplace (such as the jobsites ...), the start of the workday is triggered at the designated meeting place, and subsequent travel is part of the day's work and must be counted as hours worked for purposes of the FLSA, regardless of contract, custom, or practice." *Dole, supra*, at *4-5. The fact that some employees took their own cars from the shop to job site, and others took company trucks, does not render that travel non-compensable. *See* 29 C.F.R. § 785.40.

As there are material issues of fact in dispute on this claim, summary judgment must be denied. *See Brubach v. City of Albuquerque*, 893 F. Supp. 2d 1216, 1229 (D.N.M. 2012) (denying a MSJ because "a factual dispute exists with respect to whether Plaintiffs arrived early only because it was their *personal preference*" (emphasis added)); *Preston, supra*, 90 F. Supp. 2d 1267.[8]

### 2. Defendants' Cited Case law is Distinguishable

Defendants' cited case law is not instructive. At the outset, "each case involving compensation for travel time 'must be decided upon its peculiar facts.'" *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1350 (10th Cir. 1986); *D A & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 554-55 (10th Cir. 1958).[9] The issue of whether work is compensable under the FLSA is a mixed question of law and fact "because the precise nature of the employee's duties is a question of fact,

---

averaging 1.5 hours was necessary before the work could begin. Once at the job site, the employees worked a daily average of nine hours. Finally, the return trip to Bridgeville consumed another 1.5 hours. Thus, the Court finds, on the basis of pattern and practice evidence, that the average work day of defendants' employees, measured from the 6:00 A. M. starting time until the return to Bridgeville in the evening, lasted twelve hours. The standard five day week followed by defendants, accordingly, totaled sixty hours. *Id.*

[8] *Preston* found genuine issues of material fact remained as to whether workers were "entitled to pay for pre-travel waiting time, travel time, return travel, and post-travel waiting time." *Id.*

[9] Finding that "employees who *transport equipment* without which well servicing could not be done, are performing an activity which is *so closely related to the work which they and the other employees perform*, that it *must be considered an integral and indispensable part* of their principal activities (emphasis added)." *Id.*

while application of the FLSA to those duties is a question of law."[10] *Baker v. Barnard Const. Co.*, 146 F.3d 1214, 1216 (10th Cir. 1998).

Defendants cite *Crenshaw* for the proposition that trucks must have critical equipment to render travel time compensable – however the facts here show glaziers *do* transport necessary tools and materials to the job site. *Vega* deals with home-to-work commute time, which is not a minor factual distinction, rather a fundamentally different type of travel than at issue which renders it inapposite. *See Vega v. Gasper*, 36 F.3d 417 (5th Cir.1994).[11] Likewise, *Segura* dealt with travel from home to job site, which is wholly distinguishable for the same reason. *See Segura, supra*, 355 P.3d at 847. Further, *Segura*'s finding that a travel time claim cannot be premised NMMWA is inapplicable here as Plaintiffs premised part of their overtime claim on the exclusion of travel claim from hours worked under FLSA.[12] The other part of Plaintiffs' overtime claim is premised on the underpayment or non-payment of prevailing wages under the NMPWMWA. *See id.* *Vega* is also distinct as the employees there did no work prior to boarding buses, i.e. they did not load tools or materials as Plaintiffs did here. *See Vega, supra*, 36 F.3d 417. Likewise, *Dolan v. Project Constr. Corp.*, 558 F.Supp.1308 (D. Colo. 1983) is distinguishable as Plaintiffs here, unlike those in *Dolan*, loaded up materials at the shop and carried tools and materials in transport.[13]

Defendants rely heavily on *See Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1284, but it is distinct because *Aztec* found no evidence that employees had to receive essential instructions, pick-

---

[10] *See generally also Gaytan v. G&G Landscaping Constr., Inc.*, No. CV 14-3395, 2015 WL 6775921 at *4 (D. N.J. Nov. 6, 2015) (finding lower-court rulings on the FLSA standard "still informative" and noting that "*Integrity Staffing* did not create a sea change in the law"). *Gaytan*, which followed *Integrity Staffing Sols., Inc. v. Busk*, 135 S.Ct. 513 (2014), found that the activities of "loading trucks with necessary tools and materials, checking the tire pressure, oil and other fluids in the truck, and greasing machines needed for that particular day" were "integral and indispensable to the principal activities"of landscaping employers and thus were compensable under the FLSA.

[11] Likewise, Defendants' citation *United Transp. Union Local 1745, supra*, 178 F.3d 1109 for the proposition that commute time in buses is not compensable is based on principle that commuting-to-work time is not compensable. There, unlike here, employees did not receive instructions at the central meeting location, nor were they picking up or loading tools. *Compare also Morillion v. Royal Packing Co*, 22 Cal.4th 575 (2000) (finding bus rides from a central meeting location to a job site to be compensable because employees were subject to the control of their employer).

[12] The MWA makes no mention of travel time, whereas FLSA does – thus *Segura* is not instructive to this Motion. *See id.*

[13] *Ralph v. Tidewater*, 361 F.2d 806 (1966) is not comparable because it dealt with the issue of whether certain activity, including the payment of overtime, was exempted under 4(a) of the Portal-to-Portal Act due to presence of collective bargaining agreements which provide for the payment of travel time.

up essential tools and materials, equipment or paperwork at the central meeting location, which is not the case here as evidenced by the deposition testimony cited in Response to UMF No. 16. *See id.* Here, as cited above, Plaintiffs testified that they have been told by foreman and superintendents to report to the shop to receive reporting instructions, pick up or drop off tools, materials, per diem payment, and essential paperwork, including their timesheets and daily logs in order to get paid. Superintendent Joe Cordova testified, as cited above, that "usually" materials are loaded and transported from the shop to the job site by glaziers. In contrast, *Aztec* found that because employees *rarely* transported tools, and therefore it was not in *ordinary* course of business, the travel time was not compensable. *See id.* at p. 1290. Further, *Aztec* Court reasoned that picking up safety gear was not compensable as held in *Reich v. IBP, Inc.*, 38 F.3d 1123 (1994), but the analysis in *Reich* was rejected in *DeAsencio v. Tyson Foods, Inc.*, 500 F.3d 361 (2007).[14] In addition to its distinguishable facts rendering it inapposite, the analysis of the travel time claim in *Aztec* is not persuasive given the Court's reliance on case law that has since been rejected. As such, Defendants arguments should be given no weight and motion summary judgment should be denied.

### 3. Plaintiffs Have Pled a Travel Time Claim

Despite this Court's overruling of Defendants' failure to plead a travel time claim objection, Defendants repeat the same argument.[15] Defendants did not file a Motion to Dismiss. They have been notice of Plaintiffs' FLSA overtime claim since November 2015, yet one year later in a MSJ, they again assert the same failure to plead argument. Defendants attempt to evade liability by continuing to press this issue with the hope of a different result.

---

[14] *DeAsencio*, *supra*, 500 F.3d 361 (rejecting *Reich* analysis and holding that instead the integral/indispensable test should be applied).
[15] In response to Plaintiffs' Motion to Compel, like here, Defendants objected to a requests for documents related to travel time as irrelevant and implored that Plaintiffs must file a leave to amend to include particularized facts related to travel time to seek them. The Court overruled the objection and ordered the documents be produced, thus recognizing their relevance. See Doc. No. 63. In fact, the Court ordered Plaintiffs to file a SAC to remove deceased named plaintiff Dennis Zamora from the action, yet did not order the addition of facts on travel time. *See id.* As a result, Plaintiffs saw no need to do so. *See also* Rule 15(a)(2) of the FRCP, which directs that "a party may amend its pleading only with ... the court's leave" and that "[t]he court should freely give leave when justice so requires."

In assessing the pleading standard, the U.S. Supreme Court has articulated: "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face…." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[16] *Twombly* does not require a recitation of specific, particularized facts.[17] *See also Skinner v. Switzer*, 562 U.S. 521, 530 (2011)(citing 5 C. Wright & A. Miller, Federal Practice & Procedure § 1219, pp. 277–278 (3d ed.2004 and Supp.2010))(stating that under the FRCP "a complaint need not pin plaintiff's claim for relief to a precise legal theory. Rule 8(a)(2) of the [FRCP] generally requires only a plausible "short and plain" statement of the plaintiff's claim, not an exposition of his legal argument.").

The Second Amended Complaint ("SAC") states that Plaintiffs "are consistently required to work over forty (40) hours in a seven-day workweek" and "were not adequately compensated with overtime compensation for time worked in excess of 40 hours in one week," thus showing that their entitlement to overtime relief is plausible, rather than it merely conceivable. *See id.*; SAC, ¶¶ 4,7; *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1191 (10th Cir. 2009) ("The complaint 'does not need detailed factual allegations,' but the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" (internal citations omitted) (quoting *Twombly*, 550 U.S. at 1965)). To support their argument, Defendants cite to three cases – all of which are factually distinguishable, and thus, should be no weight.[18] *Aztec* is not instructive given its distinct procedural

---

[16] *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) defines plausibility:
  [P]lausibility in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible. The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (internal citations omitted).

[17] In examining a complaint against the pleading standard, *Bell* articulated: "[O]ur concern is not that the allegations in the complaint were insufficiently "particular[ized]," […], rather, the complaint warranted dismissal because it failed in to render plaintiffs' entitlement to relief plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569, fn. 14 (2007).

[18] Defendants' other citations are also inapposite. The Complaint in *Sambhi v. Singh*, No. 09-CV-1053 MCA/RLP, Mem. Op. of Aug. 31, 2010, merely alleged that "Defendants were acting as fiduciaries of Plaintiff's [sic] and [the Corporations]," which was found "threadbare" because plaintiffs alleged no facts to show that a fiduciary duty existed. See *id.* (*citing Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 820 P.2d 1323, 1326 (1991) ("Whether a duty exists is generally a question of law….."). Likewise, the complaint examined in *Armijo*, also cited by Defendants, is distinct because it contained only legal conclusions, but no factual basis for a court to determine that a plaintiff may be entitled to relief. *Armijo v. New Mexico Dep't of Transp.*, No. CIV-08-0336 JB/ACT, Mem. Op. of Apr. 06, 2009.

posture and facts. The *Aztec* Court ruled that the plaintiffs had not raised a wage claim based on time spent in safety meetings and donning safety gear *until the pretrial order* as they *did not articulate the claim in any briefing over a fourteen-month period. See Aztec*, 462 F.3d at 1284. Under these facts, the Court found that the complaint did not support the claim because the only reference to "work" is to work specifically performed "[d]uring this travel to and from the well site," whereas Plaintiffs' Complaint references to any and all work which exceeded 40 hours in a workweek, but was not paid at overtime, which encompasses travel time. *See id.*

Plaintiffs' Complaint's statements quoted above, if taken as true, allows the Court to determine that a violation of FLSA is plausible. *See Twombly*, 550 U.S. at p. 570. In contrast, if the Complaint merely alleged: "Southwest Glass's timekeeping policies and practices violated FLSA," it would be an insufficient, bare legal conclusion without factual support as present in the complaints examined in *Sambhi* and *Armijo. See Sambhi*, *supra*, No. 09-CV-1053; *Armijo*, *supra*, No. CIV-08-0336. For these reasons, Defendants' repeated attempt at the argument still fails and Plaintiffs' FLSA overtime claim should not be dismissed.

B.    **Audits do not establish that Defendants paid glaziers correctly and there are material issues of facts with respect to Plaintiffs' NMPWMA claims, thus summary judgment must be denied**.

Defendants claim that summary judgment must be granted because they believe the DWS's failure to point out violations specifically related to the practices Plaintiffs have articulated as resulting in the underpayment of glazier prevailing wages and fringe benefits is dispositive to this suit's claims. Defendants go as far as to leap that it establishes they "paid glaziers correctly," and thus are entitled to summary judgment. Defendants cite to no case law to support this position. For the below reasons, Defendants have not and cannot support it.

The PWMWA serves "to ensure that employees of contractors working on state ... projects are protected from substandard earnings." *Universal Commc'ns Sys., Inc. v. Smith*, 104 N.M. 754, 755 (1986). "Statutes such as these are intended to protect the workers for any difference between locally

prevailing wages and wages actually received." *Universal Communications Systems, Inc. v. Smith*, 104 N.M. 754, 755 (1986). The statute also prevents the importation of cheap labor. *See generally id.*

First, there were NMPWMWA violations, including failure to pay all wages and fringe benefits owed, detected during the DWS audits. Second, the policies and practices actually reviewed and investigated during audits are not stated in the audit findings letters, and thus are unknown. Third, even assuming for argument-sake that DWS was aware of and thoroughly investigated all pay and timekeeping practices at issue in this lawsuit, its findings are not the proper legal basis to grant summary judgment for multiple reasons outlined herein. Such a finding would disregard the requirements of collateral estoppel. Moreover, the mere existence of a duty to act does not in and of itself prove that DWS thoroughly investigated Defendants' practices and fully complied with that duty. *See New Mexico Bldg. and Const. Trades Council v. Dean*, 353 P.3d 1212, 1217-1218 (2015), (issuing a writ of mandamus based on a finding that DWS *failed to comply with its duty* to set prevailing wages for a *five-year period*). SWG too has a duty to follow federal and state wage and hour laws, but such duty does not alone establish it did so.[19]

For claim preclusion to preclude litigation of an issue, the moving party must demonstrate that the state agency "(1) act[ed] in "a judicial capacity"; (2) resolve[d] "disputed issues of fact properly before it"; and (3) the parties have had "an adequate opportunity to litigate" the issue, then the court may grant the state agency's decision preclusive effect to the extent that it would have received preclusive effect in state court. *See Salguero v. City Of Clovis*, 366 F.3d 1168, 1173 (10th Cir. 2004) (*citing Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986). If *Elliott*'s three requirements are met,

---

[19] In *New Mexico Bldg. and Const. Trades Council v. Dean*, 353 P.3d 1212, 1217-1218 (2015), the Court found that DWS Director Dean failed to comply with his duty under the NMPWMA. The Court found such failure prejudiced the rights of every mechanic and laborer on public works projects in New Mexico. The Court reasoned:

> The Unions represent employees whose wages have been, and continue to be, directly affected by the Director's failure to comply with the Act. Although Section 13–4–15 provides an avenue to appeal "any determination, finding or action of the [D]irector made pursuant to the [Act]," this remedy is wholly inadequate under these circumstances.[] It has been over five years since the Act was amended, and the Director still has not set prevailing wage and prevailing benefit rates according to CBAs. DWS has been simply setting the rates the same as those that have been in effect since 2010 […] after five years with no increase in wage rates, these stale wages are prejudicing the right of every mechanic and laborer on a public works project to be paid a wage rate consistent with applicable CBAs. *Id.*

New Mexico courts apply collateral estoppel to *administrative hearings* provided: "(1) the party against whom collateral estoppel is asserted [was] a party in or in privity with a party to the original action; and (2) the two cases [ ] concerned the same ultimate issue of fact, which was (a) actually litigated, and (b) necessarily determined in the first suit." *DeLisle v. Avallone*, 874 P.2d 1266, 1269 (1994). If the party invoking the doctrine provides sufficient evidence to meet all elements of this test, it establishes a prima facie case. *See Shovelin v. Central New Mexico Electric Cooperative, Inc.*, 850 P.2d 996, 1000 (1993). At that point, the "burden shifts to the party opposing collateral estoppel to show that he or she was not afforded a full and fair opportunity to litigate the issue in the prior proceeding." *Padilla v. Intel Corp.*, 964 P.2d 862, 865 (1998). The New Mexico Court of Appeals has noted that courts must inquire as to whether "procedural differences between the two actions, such as representation by counsel, presentation of evidence, questioning of witnesses, and appellate review, would make preclusion unfair, and whether policy considerations exist to deny any preclusive effect" of an administrative decision. *Mascarenas v. City of Albuquerque*, 274 P.3d 781 (2012). Before even examining the legal elements, Plaintiffs note audits were not fact-finding hearings subject to cross examination and no representation by counsel was available. The procedural differences between the audits and litigation render preclusion untenable as there no "full and fair opportunity to litigate" was provided. *See id.*

Cases examining whether audits or other administrative findings are entitled to preclusive effect in subsequent litigation have concluded that similar non-adjudicatory administrative findings have not preclude future claims. *See, e.g.*, *In Re Albright*, 2013 WL 6076696 (Nov. 19 2013) (finding prior prevailing wage-related audits did not preclude claims);[20] *Kremer v. Chem. Constr. Co.*, 456 U.S.

---

[20] *In re Albright* reasons that prevailing wage audits do not represent a final adjudication and are not preclusive:
> […] [T]he Citations [audits] are not entitled to preclusive effect against the Claimants […] the Attorney General's investigation is not an administrative remedy for aggrieved parties, but a mechanism for the enforcement and vindication of the laws of the Commonwealth. […] [T]he complaining party does not control the investigation. […] I am also wholly unpersuaded that the investigation, by itself, is an adjudicatory proceeding. Therefore, I find that the Claimants are not in privity with the Attorney General, were not parties to the investigation, and that the Citations do not represent a final adjudication of the same claims and issues as are now before me.

461, 480 (1982) (finding that the application of a state's preclusion rules to unreviewed decisions made by state bureaucracies only applies if the agency acted in a judicial capacity; that is, if it resolved disputed issues of fact after giving the parties a full and fair opportunity to litigate); *Lipsky v. Commonwealth United Corps.*, 551 F.2d 887, 893 (1976) (finding that "consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues … can not be used as evidence in subsequent litigation between the corporation and another party"); *Jones v. Hamic*, 875 F.Supp.2d 1334, 1348 (2012)(finding that federal court must scrutinize the procedures used by the state agency to reach the result that it reached, measuring their quality, extensiveness, and fairness).

At the outset, to establish preclusion Defendants must show: (1) final adjudication was entered on the legal claims at issue and (2) Plaintiffs were parties to the prior adjudication and (3) that Plaintiffs had a full and fair opportunity to litigate the issues. *See Elliott*, *supra*, 478 U.S. at 798. Defendants have not and cannot establish these requirements. First, there is no evidence that Plaintiffs initiated the audits. All Plaintiffs were not parties to them. Defendants have not and cannot establish that audits examined all of the payroll and time records of Plaintiffs during the recoverable period. The audits represent the findings of a state investigator and the product of a different burden of proof. There was no judicial proceeding or final adjudication rendered, rather there were findings of a state investigator that were the product of a different burden of proof.

The DWS findings' letters do not say what was specifically investigated, the reasons for the findings, nor do they explicitly condone SWG's time and pay classification practices. Audits of 7 projects on unknown topics, out of the 276 projects conducted in the recoverable period, is not dispositive of Plaintiffs' claims. Defendants try to pass off detected Public Works Minimum Wage Act violations as "minor," "trivial" and "trifling." To be clear, the audits looked only at a limited group of employees on only 7 out of a total of 276 projects in the recoverable period. A violation of the NMPWMA should not characterized as "minor." Further, if one extrapolates those detected

violations across the class of 250 employees for all 276 projects, the detected violations cannot fairly be characterized as "minor." As detailed in the statement of DMF in response to UMF No. 13, the Court only has Defendants' conflicting testimony on verbal discussion with DWS that automatic designation of eight hours per pay period, regardless of actual time spent, as "set-up" and "material distribution" time paid at $15.91 per hour (laborer rate), rather than $20.15 per hour (glazier rate) was acceptable. Defendants' characterization that DWS "instructed" SWG to designate time as such is overstated and disputed among Defendants' own witnesses. It is also contradicted by SWG's direction that employees are responsible for recording their own time.

Even accepting Defendants' flawed arguments as true, there remain material issues of fact as to what work time Plaintiffs actually performed based on the evidence that SWG allowed foremen to complete timecards on behalf of glaziers, and superintendents and its payroll administrator to delete or change time entries on timecards, which resulted in work tasks being omitted or inputted incorrectly. For the above reasons, summary judgment must be denied.

## VI. CONCLUSION

Defendants failed to show an absence of material issues of fact on all elements of the claims and their affirmative defense and failed to show they are entitled to summary judgment as a matter of law. Moreover, Plaintiffs have shown that there are material issues of fact in dispute.

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment.

Respectfully submitted,

WEINBERG, ROGER & ROSENFELD
A Professional Corporation

By:  /s/ Caren P. Sencer
DAVID A. ROSENFELD, Bar No. 058163
CAREN P. SENCER, Bar No. 233488
1001 Marina Village Parkway, Suite 200
Alameda, California 94501-1091
Telephone 510.337.1001
Fax 510.337.1023
Attorneys for Plaintiffs

By:     /s/ James Montalbano
        JAMES MONTALBANO
        SHANE YOUTZ
        900 Gold Avenue S.W.
        Albuquerque, NM, 87102
        Tel: (505) 244-1200
        Fax: (505) 244-9700
        Attorneys for Plaintiffs

I hereby certify that on this 4th day
of November, 2016, the foregoing Pleading
was e-filed via the CM/ECF
System and served via electronic
notification on all parties of record.

/s/ Caren P. Sencer
Caren P. Sencer